Tiller v. Phillips, 2025 NCBC 63.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

LISA MACKENZIE TILLER and
WILLIAM PORTER TILLER,

and

WILLIAM PORTER TILLER AS
TRUSTEE OF THE TILLER GST
INVESTMENT TRUST U/A/D
FEBRUARY 8, 2021, Individually
and Derivatively on Behalf of
MedShift, LLC,

     Plaintiffs,

v.

BRIAN S. PHILLIPS, BRIAN S.
PHILLIPS, AS FAMILY TRUSTEE
OF THE PHILLIPS
IRREVOCABLE TRUST U/A/D
AUGUST 20, 2007, and BRIAN S.
PHILLIPS, AS TRUSTEE OF THE
WAYNE E. WALCHER LIVING
TRUST (RESTATED) DATED
DECEMBER 17, 1996 U/A/D
SEPTEMBER 30, 2004,

     Defendants,

and

MEDSHIFT, LLC,

     Nominal Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
24CV048534-590

**ORDER AND OPINION ON
PLAINTIFFS' MOTION TO STRIKE,
DEFENDANTS' MOTION TO
DISMISS, AND NOMINAL
DEFENDANT'S MOTIONS TO
DISMISS**

1.     This matter is before the Court on the motions to dismiss Plaintiffs' amended complaint filed by Defendants and Nominal Defendant pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the North Carolina Rules of Civil Procedure, (ECF Nos. 51, 54), and Plaintiffs' motion to strike or, alternatively, dismiss the non-derivative demand-related arguments in Nominal Defendant's motion to dismiss, (ECF No. 63).

2.     This matter came before the Court for a hearing on the motions on 3 July 2025, with all parties represented by their respective counsel of record. (ECF No. 80). The Court, having considered the motions, the oral and written arguments of counsel, the amended complaint, and (with respect to the motion to strike and the Rule 12(b)(1) portions of the motions only), all appropriate evidence of record, concludes for the reasons stated below that the motion to strike should be **DENIED without prejudice** and the motions to dismiss should be **GRANTED in part** and **DENIED in part** as set forth below.

> *James, McElroy & Diehl, P.A. by John R. Brickley and John R. Buric, for Plaintiffs Lisa Mackenzie Tiller, William Porter Tiller, and William Porter Tiller as trustee of the Tiller GST Investment Trust U/A/D February 8, 2021.*
>
> *Johnston, Allison & Hord, P.A. by Michael J. Hoefling, James Nathaniel Pierce, William D. McClelland, and Greg C. Ahlum, for Defendants Brian S. Phillips, Brian S. Phillips as Family Trustee of the Phillips Irrevocable Trust U/A/D August 20, 2007, and Brian S. Phillips, as Trustee of the Wayne E. Walcher Living Trust (Restated) Dated December 17, 1996 U/A/D September 30, 2004.*
>
> *Holland & Knight, LLP by Michael A. Grill and Nishma Patel, for Nominal Defendant MedShift, LLC.*

Houston, Judge.

## I. FACTUAL AND PROCEDURAL BACKGROUND

3. The Court does not make findings of fact with respect to the motions.[1] Rather, the Court summarizes the allegations asserted in the amended complaint that are relevant to the motions before the Court.

4. Nominal Defendant MedShift, LLC ("**MedShift**" or "**Nominal Defendant**") is a North Carolina limited liability company with its principal place of business in Mecklenburg County. (Am. Compl. ¶ 4, ECF No. 35).

5. Plaintiffs Lisa Tiller and William Tiller and defendant Brian S. Phillips were the primary founders of MedShift, which they formed in 2015 to provide services in the medical field. (Am. Compl. ¶ 11; Second Amended and Restated Operating Agreement ("**Operating Agreement**") § 2.5, ECF No. 53.1).[2]

6. Phillips is the trustee of both the Phillips Irrevocable Trust (the "**Phillips Trust**") and the Wayne E. Walcher Living Trust (the "**Walcher Trust**"), both of which are North Carolina trusts. (Am. Compl. ¶¶ 6–7). The two trusts are members

---

[1] Courts generally do not make findings of fact with respect to Rule 12 motions to dismiss and need do so for motions to strike and similar motions only where expressly requested by a party, which is not the case here. *See* N.C. R. Civ. P. 52(a)(2)–(3); *Maynard v. Crook*, 289 N.C. App. 357, 367 (2023) ("As resolution of evidentiary conflicts is not within the scope of Rule 12 and findings of fact in a Rule 12 order are not binding on appeal, an order granting a Rule 12(b)(6) motion to dismiss generally should not include findings of fact." (citation omitted)).

[2] The Second Amended and Restated Operating Agreement, (ECF No. 53.1), is referenced and incorporated into the amended complaint and was provided by Defendants in briefing. Though it is unclear whether the document is fully executed, Plaintiffs also rely on and cite to the document in their briefing, (*e.g.*, ECF No. 69 at 4), and the Court considers it accordingly. *Oberlin Cap., L.P. v. Slavin*, 147 N.C. App. 52, 60 (2001) ("[W]hen ruling on a Rule 12(b)(6) motion, a court may properly consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers even though they are presented by the defendant." (citation omitted)).

of MedShift, and, together, they hold a majority ownership interest in MedShift. (Am. Compl. ¶ 13).

7. On 20 February 2016, MedShift and Mr. Tiller entered into a Founder Level Appreciation Rights Agreement granting Mr. Tiller 33.33 Units (representing 33.33% of "Net Proceeds"), effective 15 December 2015. (Am. Compl. ¶¶ 14–15). Phillips signed that agreement on behalf of MedShift. (Am. Compl. ¶ 14).

8. The same day, MedShift and Mr. Tiller also entered into a Consulting Agreement, which was incorporated into the Founder Level Appreciation Rights Agreement. (Am. Compl. ¶ 16). Under the Consulting Agreement, Mr. Tiller agreed to provide consulting services to MedShift, but, as Mr. Tiller was employed full-time elsewhere in the medical sales industry, the parties also agreed that he would "continue his current employment until such time as [MedShift] and [Mr. Tiller] agree otherwise[.]" (Am. Compl. ¶ 18). Thereafter, Mr. Tiller provided services to MedShift and ultimately joined the company "in an active commercial role" in the fall of 2019. (Am. Compl. ¶ 19).

9. In early 2016, Ms. Tiller left her employment elsewhere and joined MedShift in an unpaid capacity, providing marketing, sales, and customer engagement services to the company. (Am. Compl. ¶ 20).

10. Over the course of their involvement with MedShift, Plaintiffs actively fundraised for MedShift, made loans to the company, and helped secure loans from others for the company. They also obtained customers for the company and marketed its services. (Am. Compl. ¶¶ 20–21, 27).

11. On or about 16 January 2020, after Mr. Tiller had joined MedShift full time, Phillips formed East Boulevard Development Holdco, LLC and East Boulevard Development Company, LLC. Later, East Boulevard Development Company, LLC acquired thirteen properties for redevelopment in Charlotte, North Carolina (the "**East Boulevard Project**"). (Am. Compl. ¶ 23).

12. In turn, Phillips, East Boulevard Development Company, LLC "and/or" East Boulevard Holdco "partnered" on the East Boulevard Project with an England-based entity, Micota Capital, through a separate North Carolina limited liability company that it created (Micota Capital, LLC). (Am. Compl. ¶¶ 24–25).

13. To secure real estate financing from Micota,[3] Phillips "pledged the Phillips Trust's and/or Walcher Trust's shares of MedShift" as collateral and also agreed around 14 February 2020 to appoint Micota's founder, Alfred Foglio, to MedShift's board. (Am. Compl. ¶¶ 25–26).

14. Thereafter, in late 2020 and early 2021, Phillips caused MedShift to repay approximately $5 million in loans to the Phillips Trust or Walcher Trust without disclosing the loan repayment to MedShift's members. (Am. Compl. ¶ 28).

15. In May 2021, at Phillips's request and based on his suggestion that it would increase the company's EBITDA and allow them to claim depreciation, the Tillers converted their 33.33 Units in MedShift (which were terminated) into a 17.5% profit interest in MedShift. Phillips told the Tillers that "their compensation would need to be in the form of 'distributions or advancements'" that would ultimately "convert to

---

[3] The amended complaint refers simply to "Micota" and does not clearly indicate to which of the two Micota entities it refers.

K-1 income should there be a change in control of" MedShift. (Am. Compl. ¶¶ 29–35). As part of that same set of transactions, MedShift and Mr. Tiller terminated the Consulting Agreement, and the Tillers released MedShift and Phillips from claims related to the Consulting Agreement and the prior units. (Am. Compl. ¶¶ 33–34).

16.     The Tillers, in turn, received 22,925 non-voting common units in MedShift effective as of 8 July 2020. (Am. Compl. ¶ 35).[4] As part of an "Incentive Unit Grant Agreement" executed in connection with the transaction, with certain exceptions and subject to the Tillers' continued service or employment with MedShift, the common units would vest, and the Tillers would receive distributions, upon the earlier of (i) a sale of MedShift or (ii) 1 June 2025. If the Tillers were terminated, all of the Tillers' unvested units would be forfeited. (Am. Compl. ¶¶ 35–37).

17.     Contemporaneously with the parties' execution of the various documents around 19 May 2021, the Tillers transferred their 22,925 common units in MedShift to plaintiff Tiller GST Investment Trust u/a/d 8 February 2021 (the "**Tiller Trust**"). (Am. Compl. ¶ 40).

18.     At the same time, MedShift adopted the Operating Agreement. (Am. Compl. ¶ 41). As of that date, the Tiller Trust was the sole holder of all Common Units in MedShift, (Am. Compl. ¶ 42), but the Tillers also joined as parties to the Operating Agreement by executing a Joinder to Amended and Restated LLC Agreement of MedShift, LLC, (Am. Compl. ¶¶ 38, 41).

---

[4] Based on Plaintiffs' allegations, many of the agreements at issue were either retroactive or backdated, as Plaintiffs allege that the agreements were executed in mid-2021 but "effective" as of 8 July 2020. (Am. Compl. ¶¶ 34–35).

19. Under the Operating Agreement, MedShift has a three-member board of managers. That board initially consisted of Phillips, Foglio (or another of Micota's designees), and Phil Van Etten, with Phillips having five of the seven board votes and the other board members having one vote each. (Am. Compl. ¶¶ 43–44; ECF No. 53.1 § 6.1(b)).

20. Though the Walcher Trust and the Phillips Trust are members of MedShift and though Phillips serves as a member of the board, Phillips is not personally a member of the company. (Am. Compl. ¶¶ 13, 43–44; *see generally* ECF No. 53.1).

21. Among other provisions of the Operating Agreement, the parties agreed to eliminate any normally existing fiduciary duties or other duties by board members to MedShift, its members, and other board members:

> To the maximum extent permitted by Applicable Law (including [Chapter 57D of the North Carolina General Statutes]), no Board Member shall have any duties (including fiduciary duties) or liabilities related thereto to the Company, the Members, or any other Board Member . . . Notwithstanding the foregoing, nothing contained in this Section 6.2(a) will be deemed to be a waiver of the implied covenant of good faith and fair dealing by the Board of Managers under [Chapter 57D of the North Carolina General Statutes].

(ECF No. 53.1, § 6.2(a)).

22. MedShift's members also disclaimed and waived all potential fiduciary duties by any member to other members and limited the members' obligations to those "expressly set forth" in the Operating Agreement:

> This Agreement is not intended to, and does not, create or impose any fiduciary duty (or liability for breach of fiduciary duty) on any Member, any of such Member's representatives, or any of their respective Affiliates, officers, managers, shareholders, partners, members, agents and employees (the "Member's Parties"). Further, to the maximum

extent permitted by Applicable Law (including [Chapter 57D of the North Carolina General Statutes]), all other Members hereby waive any and all fiduciary duties that, absent such waiver, may be implied by law or equity, and in doing so, recognize, acknowledge and agree that the duties and obligations of the Member's Parties to the other Members and to the Company are only as expressly set forth in this Agreement.

(ECF No. 53.1, § 6.4(c)).

23. The Operating Agreement also provides for readily available access to and inspections of books and records for all members of MedShift:

> The Company shall permit and cause its Controlled Companies to permit the Members and such persons as such Members may designate, at such Member's expense, to visit and inspect any of the properties of the Company and its Controlled Companies, examine their books and take copies and extracts therefrom, [and] discuss the affairs, finances and accounts of the Company[.]

(ECF No. 53.1, § 9.2).

24. On 24 May 2022, Phillips wrote himself a check from MedShift for $925,000, which he allegedly used to purchase real estate and a restaurant three days later through another of his companies. (Am. Compl. ¶ 45).

25. Throughout 2022, the Tillers and Phillips discussed a potential sale of MedShift, but Phillips ultimately rejected the offers received in late 2022 as too low. (Am. Compl. ¶ 47).

26. In late 2022, Mr. Tiller joined MedShift's board, replacing Ms. Tiller[5] at Phillips's insistence that only one spouse could serve on the board. (Am. Compl. ¶¶ 50–51). During her time on the board, Ms. Tiller inquired about Phillips's use of

---

[5] The Amended Complaint alleges that Ms. Tiller was on MedShift's board for a period of time, but there is no indication when she became a board member or when her board seat was vacated in favor of Mr. Tiller. (Am. Compl. ¶ 51).

MedShift's funds and sought "various Company records[.]" (Am. Compl. ¶ 51). Plaintiffs do not suggest that she was unable to see those records. Instead, they allege that Phillips "wanted Ms. Tiller off the Board in an effort to stop her inquiries in[to] the Company's finances and Phillips'[s] conduct." (Am. Compl. ¶ 51).

27. At that time, Phillips attempted for the first time to purchase the Tiller Trust's membership interest in MedShift, offering what the Tillers determined to be a "low and unrealistic valuation" of the Tiller Trust's interest. (Am. Compl. ¶ 54). Plaintiffs allege that Phillips thereafter attempted on multiple occasions to purchase the Tiller Trust's interest in MedShift, each time without success because the Tillers had no interest in selling under the terms offered. (Am. Compl. ¶¶ 54, 88, 90).

28. Around that same time, "[i]n December 2022, Phillips told the Tillers that MedShift needed a 90-day bridge loan prior to an anticipated refinance." (Am. Compl. ¶ 55). At Phillips's request and apparently without further investigation, the Tillers agreed and promptly wired $1.5 million in loan funds to Phillips. The Court refers to the allegations surrounding this bridge loan as the "**Bridge Loan Dispute**." (Am. Compl. ¶¶ 55, 168; ECF No. 69 at 18). The day after the loan funds were transferred, Phillips withdrew $685,000 from MedShift to make a payment on the East Boulevard Project. (Am. Compl. ¶ 56).

29. Through the end of 2022, Plaintiffs contend upon information and belief that Phillips "diverted more than $14 million from the Company for his other endeavors" while commingling his funds with MedShift's and those of the Phillips

Trust and Walcher Trust and making distributions from MedShift only to those two trusts. (Am. Compl. ¶¶ 57–58).

30. Plaintiffs also contend that an unspecified combination of "Phillips and/or the Phillips Trust and/or the Walcher Trust" have kept in excess of $2 million worth of cash-back rewards from MedShift's credit card. (Am. Compl. ¶ 59).

31. Throughout this dispute, Phillips has continued to receive an annual salary of $420,000 from MedShift and has withdrawn over $800,000 quarterly to cover interest payments on the East Boulevard Project. (Am. Compl. ¶¶ 52, 85).

32. In early March 2023, the Tillers met with Foglio to discuss the creation of a 20% equity pool into which the Tillers would contribute the shares.[6] Foglio suggested that having the Tillers contribute the equity would be most beneficial for the overall wellbeing of the East Boulevard Project. (Am. Compl. ¶¶ 61–62). While the Tillers initially rejected the proposal, Phillips and Foglio continued to promote an equity pool. (Am. Compl. ¶ 63). Eventually, Phillips suggested a 15% equity pool, with a "50/50 split between Phillips and the Tillers, such that each [would] contribute 7.5%, which would effectively reduce the Tiller Trust's shares to 10%." (Am. Compl. ¶ 64). The Tillers asked for various information concerning the equity pool, discussed the pool with Phillips (including both sides' understanding of the Operating Agreement and their obligations, if any, with respect to the equity pool), and requested an opportunity for their attorney to review any amendments to the

---

[6] Though Plaintiffs repeatedly refer to potential contributions by the "Tillers," it appears that Plaintiffs intend to refer to the Tiller Trust, given its alleged ownership interest in MedShift.

Operating Agreement necessitated by the equity pool arrangement. (Am. Compl. ¶¶ 65–67).

33.    Ultimately, Phillips requested on 31 March 2023 that the Tillers immediately "sign documentation" (an "Acknowledgement and Consent") to authorize a refinance of MedShift's loans (including the $1.5 million bridge loan from the Tillers), authorize the equity pool, and amend the Operating Agreement. (Am. Compl. ¶ 68). The Tillers did so.

34.    Plaintiffs assert that they did so only "[u]nder duress" because Defendants wrongfully suggested there was an urgency to do so and because Phillips told Plaintiffs that the refinance loan was contingent on formation of the equity pool. Plaintiffs "believed" that this meant there was a "risk [of] their $1.5 million not being paid back." (Am. Compl. ¶¶ 68–69). The Court refers to the allegations concerning the equity pool as the "**Equity Pool Dispute**."

35.    Plaintiffs contend that that neither the Phillips Trust nor the Walcher Trust contributed to the equity pool as initially discussed. (Am. Compl. ¶ 70).

36.    Thereafter, though much of the conduct appears to have little bearing on their causes of action, Plaintiffs allege that Phillips or "Defendants" engaged in a series of ongoing wrongful conduct.

37.    For example, in June 2023, "Phillips circulated an internal memorandum detailing [MedShift's] various cloud services," using information that "does not accurately describe [MedShift's] services" and "exaggerate[ing] the information for an

audit so that [MedShift] could obtain additional funding." (Am. Compl. ¶¶ 71, 171). The Court refers to these allegations as the "**Cloud Services Dispute**."

38. Similarly, Plaintiffs contend that, at an unspecified time, "Defendants" or "Phillips," depending on the paragraph, "also exaggerated MedShift's financials in order to avoid having to restate prior financials, to avoid restatement of the credit agreement with one of MedShift's lenders, and to avoid a federal and state income tax liability." (Am. Compl. ¶¶ 72, 172). The Court refers to these allegations as the "**Credit Agreement/Income Tax Dispute**."

39. Also at unspecified times, Plaintiffs assert that "[d]espite representations to the contrary, Defendants did not pay all [MedShift's] taxes, file in each state where [MedShift] received income/had employees, and/or pay estimated quarterly taxes for [MedShift], resulting in [MedShift] consistently being burdened with interest and penalties." (Am. Compl. ¶¶ 73–74, 173; ECF No. 69 at 18–19). The Court refers to these allegations as the "**Quarterly Taxes Dispute**."

40. Around October 2023, though he did not own it, Phillips engaged in negotiations with an investor for the potential sale of the Tiller Trust's membership interest in MedShift. (Am. Compl. ¶ 84). At that same period in mid-to-late 2023, MedShift converted the Tillers' health insurance to COBRA coverage and sought reimbursement of certain payments to the Tillers as having been overpayments. Plaintiffs contend that these actions were all part of an effort to portray the Tillers as no longer involved in MedShift's operations. (Am. Compl. ¶¶ 75–85).

41. Ultimately, in November 2023, following additional discussions and further efforts by Phillips (and Foglio on his behalf) to purchase the Tiller Trust's membership interest in MedShift, (Am. Compl. ¶¶ 88–90), Foglio requested that the Tillers sign a General Release and Separation Agreement from MedShift. The Tillers declined.

42. Within a matter of days, MedShift notified the Tillers that it was retroactively terminating Mr. Tiller's employment effective 31 December 2022 and prospectively terminating Ms. Tiller's employment effective 31 December 2023, though Mr. Tiller's role as a board member was confirmed. (Am. Compl. ¶¶ 91–98).

43. Phillips (and Foglio on his behalf) thereafter continued to engage in discussions with the Tillers regarding Phillips's potential purchase of the Tiller Trust's interest in MedShift. (Am. Compl. ¶¶ 99–103, 118–20).

44. After continued discussions, between 27 December and 31 December 2023, the Tillers and Phillips negotiated and finalized an agreement for Phillips to purchase the Tiller Trust membership interest for $6 million, plus repayment of $2.3 million in loans and other debt. (Am. Compl. ¶¶ 102–03). As a result, the parties executed an Assignment of Equity Interests, effective 31 December 2023.[7] (Am. Compl. ¶ 103).

45. On 8 January 2024, Phillips indicated that "everything looked good to close" within forty-five days. (Am. Compl. ¶ 104). However, Phillips never made the

---

[7] The Assignment of Equity Interests is not attached to the amended complaint, and Plaintiffs make no factual allegations regarding the substance of that document. Ultimately, they aver that the sale was not consummated because Phillips did not make the requisite payments, (Am. Compl. ¶ 108), though it is unclear whether the Assignment of Equity Interests was in any way contingent on the payments or whether it was, in fact, effective on 31 December 2023, regardless of the future payments.

requisite payments, and the sale of the Tiller Trust membership interests did not close. (Am. Compl. ¶ 108). Eventually, the Tillers discovered that Blue Marlin, a third party, had negotiated to acquire a 20% minority stake in MedShift for $40 million—far above the Tillers' valuation of MedShift. Phillips never disclosed the anticipated Blue Marlin transaction to the Tillers and instead asserted that the funds for his purchase of the company—had it closed—would come from personal resources. (Am. Compl. ¶¶ 106–08).

46. On 25 April 2024, Phillips provided the Tillers with MedShift's purported balance sheets for 2022 and 2023 and claimed that MedShift was not performing well. (Am. Compl. ¶ 109).

47. The Tillers allege that MedShift's financial condition, as represented by Phillips, differed from the information provided to other members with respect to default rates and the representation of MedShift's financial performance. Specifically, the Tillers were told MedShift had a 14% default rate in 2023, while others were told that the default rate was 5% and that MedShift had experienced a "solid year." (Am. Compl. ¶¶ 111–14).

48. On 8 May 2024, Phillips once again inquired about the Tillers' willingness to sell the Tiller Trust's shares, proposing that the Tillers loan him the purchase funds, which he would repay through monthly installments until MedShift was sold. At the same time, Phillips represented that MedShift would impose a mandatory capital call for all members due to the company's financial condition and that failure

to make the requisite capital contribution would result in noncompliant members' interests being reduced to $0. (Am. Compl. ¶¶ 115–16).

49. On 14 May 2024, Phillips again inquired about purchasing the Tillers' shares, offering $2 million. (Am. Compl. ¶¶ 118–20). Following their refusal, the Tillers allege that Phillips continued to emphasize the urgent need for them to sell their shares to him, warning that otherwise they would be required to participate in the capital call and would likely be required to contribute up to $3 million— communications that the Tillers allege only they (and not other members of MedShift) received. (Am. Compl. ¶¶ 118–21).

50. After the December 2023 transaction involving the Assignment of Equity Interests fell through due to Phillips's failure to pay and close on the transactions, the Tillers continually rejected Phillips's entreaties to sell the Tiller Trust's membership interest to him, doing so once again between May and June 2024. (*E.g.*, Am. Compl. ¶ 122).

51. Following the latest rejection, on 18 June 2024, Phillips notified the Tillers that "all units held by Plaintiffs were forfeited for zero consideration as of [31 December] 2022"—approximately a year and a half before the notice. (Am. Compl. ¶¶ 121–24). Plaintiffs, however, assert that "Phillips did not have a valid basis for claiming that all of Plaintiffs' shares and interest in the Company w[ere] forfeited" and that Phillips instead attempted to "steal" the interest. (Am. Compl. ¶¶ 125–26).

52.    Thus, the Tillers allege that the Tiller Trust remains a member of MedShift and that Phillips's actions were simply bad-faith efforts to "squeez[e] out" Plaintiffs from MedShift. (Am. Compl. ¶¶ 127–28).

53.    On 17 June 2024, Ms. Tiller sent an email to Phillips, copying Mr. Tiller, Foglio, and Plaintiffs' attorney, John Buric. (Am. Compl. ¶ 132; ECF No. 53.2). The email did not reference the Tiller Trust or suggest that it was sent on behalf of the Tiller Trust or with respect to its interest in MedShift. (*See generally* ECF No. 53.2).

54.    In the email, Ms. Tiller raised various grievances with Phillips. Among other things, she suggested that Phillips

- "singled [] out" her and Mr. Tiller and demanded that they "either accept [Phillips's] extorted $2M loan/offer or participate in a capital call";

- asked for a loan of $1.5 million before withdrawing funds for the East Boulevard Project;

- agreed to purchase the Tillers' interest in MedShift for a sum lower than she believed appropriate; and

- removed Mr. Tiller from the board "without cause under the guise of a purchase."

(ECF No. 53.2 at 1).

55.    Ultimately, however, Ms. Tiller noted that her email was an effort to negotiate a settlement between the Tillers and Mr. Phillips. To that end, Ms. Tiller noted that the Tillers sought "to avoid the publicity of litigation" and "would prefer to reach a settlement agreement." As a result, she demanded that Phillips respond to the email within forty-eight hours "in regard to [Phillips's] intentions," absent which she noted that the Tillers would "proceed with [their] lawsuit against [Phillips] and

others who benefited from [his] conduct." (ECF No. 53.2 at 1). She further insisted that Phillips "negotiate with John [Buric] as he is protecting our interests." (ECF No. 53.2 at 2).

56. The email did not demand or request that MedShift investigate Phillips's alleged conduct, nor did it request that anyone take action against Phillips—other than threatening that the Tillers themselves would sue if they did not receive a response within forty-eighty hours. (*See generally* ECF No. 53.2).

57. Plaintiffs filed their original complaint in this action on 18 October 2024. (ECF No. 3).

58. Contemporaneously with their filing of the complaint, Plaintiffs served a written demand letter on Defendants. (Am. Compl. ¶ 133; ECF No. 69 at 10 (acknowledging that the letter was "sent contemporaneously with the initial Complaint")). The letter was sent by Plaintiffs' attorney, John Buric, and was addressed to MedShift at Phillips's attention. (ECF No. 53.3 at 1). In the substance of the letter, Plaintiffs asserted, in relevant part, that Phillips:

- improperly distributed MedShift's funds for non-company purposes;

- wrongfully distributed funds to himself or the Phillips or Walcher Trusts to fund separate business endeavors such as the East Boulevard Project and two other projects;

- commingled MedShift's funds with Phillips's personal or other funds;

- wrongfully caused MedShift to guaranty debts for other projects;

- falsified information concerning a MedShift audit;

- "improperly and fraudulently coerced the Tiller Trust into selling its shares";

- wrongfully declared the Tiller Trust's membership interest in MedShift to be forfeited;

- planned to wrongfully distribute funds to himself; and

- breached his fiduciary duties and the MedShift operating agreement.

(ECF No. 53.3 at 1–2). As a result, in the letter, Plaintiffs demanded that MedShift "take suitable action to fully and completely investigate all the matters" addressed in the letter and "take action to remedy those issues," though it did not specifically request that MedShift bring suit or assert specific legal claims against Phillips. (ECF No. 53.3 at 2).

59. Plaintiffs' complaint asserts causes of action individually, and the Tiller Trust asserts causes of action individually and derivatively on behalf of MedShift. (ECF No. 3).

60. On 28 February 2025, Plaintiffs filed their amended complaint asserting causes of action for (i) a declaratory judgment; (ii) breach of contract (direct and derivative); (iii) unjust enrichment (direct); (iv) unlawful distribution (derivative); (v) alter ego; (vi) fraud (direct and derivative); (vii) conversion (direct and derivative); (viii) tortious interference with contract (direct and derivative); (ix) facilitation of civil conspiracy (direct and derivative); and (x) negligent misrepresentation (direct and derivative). (*See generally* Am. Compl.). The latter four causes of action are all asserted as "alternative" causes of action. (Am. Compl. ¶¶ 177–197).

61. Defendants and Nominal Defendant filed motions to dismiss the amended complaint on 21 April 2025, (ECF Nos. 51, 54), and Plaintiffs in turn moved to strike

Nominal Defendant's non-derivative-demand-based arguments, on 28 May 2025. (ECF No. 63).

## II.    ANALYSIS

### A.    Motion to Strike

62.    Plaintiffs move under Rule 12(f) of the North Carolina Rules of Civil Procedure to strike Nominal Defendant's non-derivative demand related arguments in its motion to dismiss on the grounds that a Nominal Defendant does not have standing to defend against the merits of a derivative action. (ECF No. 64 at 3).

63.    Pursuant to Rule 12(f), a trial court "may order stricken from any pleading any insufficient defense or any redundant, irrelevant, immaterial, impertinent, or scandalous matter." N.C. R. Civ. P. 12(f). Motions to strike "are 'viewed with disfavor and are infrequently granted.'" *Loyd v. Griffin*, 2021 NCBC LEXIS 110, at *28 (N.C. Super. Ct. Dec. 10, 2021) (quoting *Daily v. Mann Media, In*c., 95 N.C. App. 746, 748–49 (1989)). "Whether to grant or deny a motion to strike under Rule 12(f) is within the trial court's sound discretion." *Id.* (citing *Reese v. City of Charlotte,* 196 N.C. App. 557, 567 (2009)).

64.    In this instance, the Court need not resolve whether Nominal Defendant has standing to raise all of the arguments presented in its motion and briefing, as the substantive arguments it raises are largely, if not entirely, duplicative of the arguments raised by Defendants in their briefing.

65. While they disagree with the merits of the arguments, Plaintiffs do not dispute Defendants' (rather than Nominal Defendant's) standing to raise the arguments in their motion and briefing.

66. Accordingly, even if it were to strike Nominal Defendant's arguments, the Court would nonetheless hear and consider the same arguments (without objection), and the Court's ruling would be the same. Thus, to the extent the arguments overlap, Plaintiffs' argument is moot. *Roberts v. Madison Cnty. Realtors Ass'n, Inc.*, 344 N.C. 394, 398–99 (1996) ("A case is 'moot' when a determination is sought on a matter which, when rendered, cannot have any practical effect on the existing controversy." (citation omitted)).

67. As the arguments are appropriately raised by Defendants and properly considered by the Court, the Court determines in its discretion that it is not necessary or warranted to strike Nominal Defendant's motion or briefing, in whole or in part.

68. Thus, in the Court's discretion, Plaintiffs' motion to strike, (ECF No. 63), is **DENIED as moot**.[8]

### B. Rule 12(b)(1) Motions to Dismiss Putative Derivative Claims

69. The Court next addresses Defendants' and Nominal Defendant's Rule 12(b)(1) motions to dismiss.

70. A Rule 12(b)(1) motion to dismiss presents "a challenge to the trial court's subject matter jurisdiction over a plaintiff's claims." *Marlow v. TCS Designs, Inc.*, 288

---

[8] With its ruling, the Court makes no determination regarding Nominal Defendant's right or ability to raise further arguments in other proceedings, and Nominal Defendant should not construe the Court's ruling as a license to raise arguments where it is not otherwise permitted to do so.

N.C. App. 567, 572 (2023); *see also* N.C. R. Civ. P. 12(b)(1). "The plaintiff bears the burden of establishing subject matter jurisdiction." *Lau v. Constable*, 2022 NCBC LEXIS 75, at \*10 (N.C. Super. Ct. July 11, 2022).

71. "Standing is required in order to maintain subject matter jurisdiction." *Drum v. Drum*, 284 N.C. App. 272, 275 (2022); *see also Cmty. Success Initiative v. Moore*, 384 N.C. 194, 205 (2023); *see generally United Daughters of the Confederacy v. City of Winston-Salem ex rel. Joines*, 383 N.C. 612 (2022). As the party invoking jurisdiction, the plaintiff also bears the burden to prove standing. *Blinson v. State*, 186 N.C. App. 328, 333 (2007).

72. A court may consider matters outside the pleadings in determining whether subject matter jurisdiction exists. *Tart v. Walker*, 38 N.C. App. 500, 502 (1978); *see also Keith v. Wallerich*, 201 N.C. App. 550, 554 (2009).

73. "[W]henever the court does not have subject matter jurisdiction, the judge must dismiss." *O'Donnell v. City of Asheville*, 113 N.C. App. 178, 180 (1993) (citing N.C. R. Civ. P. 12(h)(3)).

74. Under N.C. Gen. Stat. § 57D-8-01, a member of a limited liability company may bring a derivative action only if

> [t]he member made written demand on the LLC to take suitable action, and either (i) the LLC notified the member that the member's demand was rejected, (ii) 90 days have expired from the date the demand was made, or (iii) irreparable injury to the LLC would result by waiting for the expiration of the 90-day period.

N.C. Gen. Stat. § 57D-8-01(a)(2).

75. A written demand "must be made with sufficient clarity and particularity to permit the [LLC] . . . to assess its rights and obligations and determine what action is in the best interest of the company." *Bourgeois v. Lapelusa*, 2022 NCBC LEXIS 111, at \*26 (N.C. Super. Ct. Sep. 23, 2022) (alterations in original) (internal quotations omitted) (quoting *Kane v. Moore,* 2018 NCBC LEXIS 157, at \*14 (N.C. Super. Ct. Nov. 26, 2018)). Among other things, the demand should clearly specify the actions that the member would have the LLC take, the claims that the member would have the LLC assert, and the persons or entities against whom those claims should allegedly be asserted. *Id.* (citation omitted).

76. A plaintiff's failure to comply with the demand requirements warrants dismissal of the derivative claims for lack of standing. *See, e.g.*, *Miller v. Burlington Chem. Co., LLC*, 2017 NCBC LEXIS 6, at \*27 (N.C. Super. Ct. Jan. 27, 2017); *Petty v. Morris*, 2014 NCBC LEXIS 67, at \*22-24 (N.C. Super. Ct. Dec. 16 2014).

77. Plaintiffs assert that they submitted two separate demands on MedShift: one via email on 17 June 2024 and another on 18 October 2024, contemporaneously with the filing of the initial verified complaint. (Am. Compl. ¶¶ 132–33; ECF Nos. 53.2, 53.3).[9] Defendants, on the other hand, argue that both communications were deficient and did not comply with applicable law. (ECF No. 52 at 4–8; ECF No. 55 at

---

[9] The demand communications are expressly referenced and relied upon in the verified amended complaint and were provided in the responsive briefing. (Am. Compl. ¶¶ 132–33 (stating that the "derivative demand is attached as **Exhibit A**"; failing to attach the exhibit); ECF Nos. 53.2, 53.3 (including copies of the referenced demand communications)). A "court may properly consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers" when ruling on a 12(b)(6) motion. *Oberlin*, 147 N.C. App. at 60. The Court considers the documents accordingly.

4–7). The Court agrees that the demands were deficient and that the putative derivative claims should therefore be dismissed.

78. The 17 June 2024 email is primarily Ms. Tiller's airing of personal grievances against Phillips on behalf of both Tillers, and the email does not suggest that it is sent on behalf of the Tiller Trust, which is the putative derivative plaintiff in this action. (Am. Compl. ¶¶ 3, 40, 42, 129). While the email summarizes certain alleged wrongdoing, such as allegedly wrongful withdrawals and wrongfully removing Mr. Tiller from the board, it makes no demand at all of MedShift. It is instead directed solely to Phillips in his individual capacity and makes demands only of Phillips—not of the company. Moreover, the email lacks any request that MedShift assert any claims or conduct any investigation and ultimately makes no effort to have MedShift take any other action against Phillips. The correspondence therefore does not serve as an adequate or proper demand under applicable law. N.C. Gen. Stat. § 57D-8-01(a)(2); *see, e.g., Garlock v. Hillard*, 2000 NCBC LEXIS 6, at *10 (N.C. Super. Ct. Aug. 22, 2000) (determining that a letter failed to satisfy derivative demand requirements when it made no mention of a derivative claim and failed to demand specific action and claims by the corporate entity).

79. The 18 October 2024 letter fares no better under N.C. Gen. Stat. § 57D-8-01(a)(2). That letter was served contemporaneously with Plaintiffs' filing of their original complaint in this action, and, as both the plain language of the statute and this Court's jurisprudence make clear, such a demand is insufficient to grant standing. N.C. Gen. Stat. § 57D-8-01(a) (noting that a member "may bring a

derivative action *if the following conditions are met*" at the time the action is filed); *see, e.g., Garlock*, 2000 NCBC LEXIS 6, at \*10–11 ("A written demand sent simultaneously with the filing of a complaint does not meet the demand requirements of the statute, nor may a complaint serve as the written demand."); *cf. Greene v. Shoemaker*, 1998 NCBC LEXIS 4, at \*10–11 (N.C. Super. Ct. Sep. 24, 1998).

80. Though Plaintiffs argue that the demand is proper because it was served more than ninety days before "the operative pleading—Plaintiffs' Verified Amended Complaint," (ECF No. 69 at 11), this argument ignores the plain language of the statute, which requires that "90 days have expired from the date the demand was made" as a perquisite before the member "may bring suit" at all—not merely before the operative complaint is filed in an already existing suit. N.C. Gen. Stat. § 57D-8-01(a); N.C. Gen. Stat. § 57D-8-01(a)(2).

81. Beyond these two letters, Plaintiffs do not argue, nor does the amended complaint allege, either that (i) they made any other demand that the company rejected before they filed suit or (ii) irreparable injury to MedShift would have resulted by waiting for expiration of the ninety-day notice period. (*See* N.C. Gen. Stat. § 57D-8-01(a)(2); *see generally* Am. Compl.; ECF No. 69). Without properly alleging one of these alternative bases for jurisdiction and without a proper demand and waiting period before filing suit, Plaintiffs lack standing to assert the putative derivative claims in this action, and they are appropriately dismissed for lack of subject matter jurisdiction.

82. Accordingly, the Court will **DISMISS** without prejudice all putative derivative causes of action and claims asserted in this action.

**C.    Rule 12(b)(6) Motions to Dismiss**

83. Defendant and Nominal Defendant next move under Rule 12(b)(6) for dismissal of each of Plaintiffs' causes of action other than for a declaratory judgment. (ECF No. 51).

84. When considering a Rule 12(b)(6) motion, the Court must determine "whether the allegations of the complaint, if treated as true, are sufficient to state a claim upon which relief can be granted under some legal theory." *Corwin v. Brit. Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (citation omitted).

85. The Court treats the well-pleaded factual allegations as true and views them "in the light most favorable to the non-moving party." *E.g.*, *Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 332 (2019) (citation omitted); *Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5 (2017). The Court must determine "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief can be granted under some [recognized] legal theory." *Forsyth Mem'l Hosp., Inc. v. Armstrong World Indus.*, 336 N.C. 438, 442 (1994) (quoting *Lynn v. Overlook Dev.*, 328 N.C. 689, 692 (1991)).

86. Further, the Court "may properly consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers even though they are presented by the defendant." *Oberlin*, 147 N.C. App. at 60. The Court "can reject allegations that are contradicted by the documents attached, specifically

referred to, or incorporated by reference in the complaint." *Moch v. A.M. Pappas & Assocs., LLC*, 251 N.C. App. 198, 206 (2016) (citations omitted).

87.     Dismissal on a Rule 12(b)(6) motion is proper if "(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Corwin*, 371 N.C. at 615 (citations omitted).

88.     As the Court dismisses the putative derivative claims for lack of standing and subject matter jurisdiction, the Court limits its discussion of Rule 12(b)(6) motions to those causes of action asserted by Plaintiffs on behalf of themselves and not in a putatively derivative capacity.

### C.1.    Alter Ego Theory/Piercing the Corporate Veil

89.     Certain of Plaintiffs' claims against Phillips are premised entirely upon an "alter ego" or veil-piercing theory. Accordingly, the Court first addresses Plaintiffs' fifth claim for relief, which they designate simply "Alter Ego." (Am. Compl. ¶¶ 159–64).

90.     In the amended complaint, Plaintiffs contend that "MedShift and Phillips are the alter ego of one another," that "MedShift was under [Phillips's] complete domination and control," that Phillips used control of MedShift "to commit fraudulent conduct," and that Phillips and MedShift "intermingled . . . assets and ownership." (Am. Compl. ¶¶ 160–64).

91.     Accordingly, Plaintiffs assert that they "can pierce the corporate veil of *MedShift* and hold *Phillips, individually* responsible for his tortious conduct." (Am. Compl. ¶ 163 (emphasis added)).

92.     As an initial matter, "although Plaintiffs bring their veil piercing theory as a claim, piercing the corporate veil is a remedy, not a separate cause of action." *Loray Master Tenant, LLC v. Foss N.C. Mill Credit 2014 Fund I, LLC*, 2021 NCBC LEXIS 15, at *24 n.4 (N.C. Super. Ct. Feb. 18, 2021) (citations omitted).

93.     "North Carolina has adopted the instrumentality rule" when analyzing liability under the theory of piercing the corporate veil. *Id.* at *26.

94.     Under the instrumentality rule, to proceed on a request for veil piercing, a party must show at least:

> (1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and
>
> (2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of [a] plaintiff's legal rights; and
>
> (3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Nicks v. Nicks*, 241 N.C. App. 487, 497 (2015) (citation omitted).

95.     Sole or common ownership of a company does not, by itself, establish complete domination and control; there must be a showing that the entity lacks a

"separate mind, will or existence of its own." *Harris v. Ten Oaks Mgmt., LLC*, 2022 NCBC LEXIS 62, at \*6 (N.C. Super. Ct. June 20, 2022) (citation omitted).

96.     The claimant must also adequately plead the existence of "an underlying legal claim to which liability may attach" with respect to the entity to be pierced. *Green v. Freeman*, 367 N.C. 136, 146 (2013) (citations omitted).

97.     Here, despite their allegations as between Phillips and MedShift, none of Plaintiffs' non-declaratory causes of action are asserted against MedShift.[10] Instead, the material wrongdoing alleged in the amended complaint is that of Phillips, who has no ownership interest in MedShift but is trustee of the Phillips Trust and Walcher Trust, which are majority owners. (Am. Compl. ¶ 13).

98.     With no substantive, non-declaratory claims against MedShift and, thus, no "underlying legal claim to which liability may attach" as to MedShift, there is simply no basis to pierce MedShift's corporate veil in an effort to reach Phillips— regardless of the merits of Plaintiffs' allegations regarding potential control of MedShift. *See Green*, 367 N.C. at 146 ("But sufficient evidence of domination and control establishes only the first element for liability. There must also be an underlying legal claim to which liability may attach. . . . Without these agency claims, however, there was no legal claim still providing a basis for liability." (citations omitted)). The motion to dismiss is therefore properly granted on this basis.

---

[10] Plaintiffs do not specify the particular defendants against whom their declaratory judgment cause of action is asserted, (Am. Compl. ¶¶ 134–38). Even construing it to be asserted against MedShift, as Nominal Defendant, however, there is no alleged wrongdoing by MedShift against Plaintiffs that would warrant piercing the corporate veil or otherwise support the existence of a legal claim to which liability and piercing might attach.

99. In response to this issue, raised tangentially by Defendants' arguments that Phillips does not have an interest in MedShift and that his only formal interest is through the Phillips and Walcher Trusts, Plaintiffs contend that

> the Trusts made promises through and acted interconnectedly with Phillips who then used his power and control as Manager of Medshift for his personal benefit. Further, Plaintiffs allege that Phillips individually, the Trusts, and Medshift commingled funds. At a minimum, the Tillers should be afforded the opportunity to explore the Phillips and the Trusts' control over Medshift through discovery and/or to the extent that it is unclear that both Phillips and the Trusts are implicated in the alter ego claims, Plaintiffs should be afforded the opportunity to amend their Complaint to reflect that they are. Plaintiffs and the Court will be in a better position to evaluate the merits of this claim after the Tillers obtain information regarding Phillips's conduct.

(ECF No. 69 at 19).

100. The amended complaint, however, does not align with Plaintiffs' arguments.

101. First, in their alter ego "claim," Plaintiffs make no reference to either the Phillips Trust or the Walcher Trust. (Am. Compl. ¶¶ 159–64). Instead, the pleadings focus specifically on MedShift and Phillips and seek to "pierce the corporate veil of *MedShift* and hold *Phillips, individually* responsible for his tortious conduct." (Am. Compl. ¶ 163 (emphasis added)). It is not merely "unclear that both Phillips and the Trusts are implicated in the alter ego claims," (ECF No. 69 at 19); rather, it is entirely unpleaded.

102. Second, to the extent that Plaintiffs seek leave to amend to address that failure, such a request made in the course of a response brief fails to comply with the Business Court Rules and is properly denied or disregarded without further

consideration. BCR 7.2 ("Each motion must be filed as a separate document. Unless listed in BCR 7.10, a motion must be accompanied by a brief. The Court has discretion to deny the motion summarily if a required brief is not filed."); BCR 7.1(c) ("The Court has discretion to disregard or strike a filing that does not comply with these rules.").

103. Third, inasmuch as Plaintiffs request "the opportunity to explore the Phillips and the Trusts' control over Medshift through discovery," (ECF No. 69 at 19), "plaintiffs may not simply state a generalized grievance and thereby gain the right to go on a discovery fishing expedition." *Smith v. City of Charlotte*, 79 N.C. App. 517, 529–30 (1986). Plaintiffs' request amounts to little more than a request that the Court enable such a fishing expedition. The Court will not do so.

104. Ultimately, whether Plaintiffs seek to hold Phillips liable for the actions of the Phillips and Walcher Trusts or the actions of MedShift, or to hold those companies liable for Phillips's conduct, Plaintiffs' allegations of control and dominion and intermingling of funds are largely conclusory and do not rise to the level necessary to establish complete dominion and control. (*E.g.*, Am. Compl. ¶ 13 ("Phillips is Trustee of, and controls, both the Phillips Trust and Walcher Trust."), ¶ 44 ("Despite there being three Board Members, Phillips controlled the Board, and thus the Company" because he had more votes that the other Board members combined), ¶ 57 ("Upon further information and belief, Phillips comingled the Company's funds with his own money, the Phillips Trust's money, the Walcher Trust's money, *and/or* money for other companies and projects he was involved in." (emphasis added))).

105. Accordingly, Plaintiffs' alter ego cause of action will be **DISMISSED**.

C.2. Breach of Contractual Duties

106. With their substantive claims, Plaintiffs first assert a cause of action for breach of contractual duties against Phillips individually and Phillips in his capacity as trustee of the Phillips Trust and the Walcher Trust. (Am. Compl. ¶¶ 139–47).

107. Specifically, Plaintiffs contend that "Defendants" collectively breached obligations under the Operating Agreement by "wrongfully converting their membership interest in MedShift, fraudulently coercing the Tiller Trust into contributing its Units into an equity pool, and by making unfounded improper threats against the Tillers related to personal guarantees and otherwise." (Am. Compl. ¶ 146). Defendants respond by noting that Phillips is not a party to the Operating Agreement, that Plaintiffs failed to specify in the complaint any particular provisions of the Operating Agreement that were allegedly breached, and that the contractual duties at issue either do not exist or have been waived. (ECF No. 52 at 17–20; ECF No. 77 at 6). Ultimately, the Court agrees with Defendants that the claim fails.

108. "The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract. The elements of a valid contract are offer, acceptance, consideration, and mutuality of assent to the contract's essential terms." *Davis v. Woods*, 286 N.C. App. 547, 561 (2022) (citation omitted).

109. As to Plaintiffs' claim against Phillips, Phillips is not a party to the Operating Agreement. Plaintiffs concede as much, arguing that Phillips should instead "be *deemed* a signatory and held individually responsible for loss attributable to the Medshift and/or the Trust's breach of contract." (ECF No. 69 at 20 (emphasis

added); *see generally* ECF No. 53.1). "[A]s a matter of law, a non-party to a contract 'cannot be held liable for any breach that may have occurred.'" *Howe v. Links Club Condo. Ass'n, Inc.,* 263 N.C. App. 130, 139 (2018) (quoting *Canady v. Mann*, 107 N.C. App. 252, 259 (1992)). Because Phillips is not a party to the Operating Agreement and because Plaintiffs' alter ego or piercing theory fails as set forth above, the motion will be **GRANTED** as to Phillips.

110. Plaintiffs' contract claims against Phillips as trustee of the Phillips Trust and Walcher Trust fare no better.

111. Under North Carolina law,

> [t]he operating agreement governs the internal affairs of an LLC and the rights, duties, and obligations of (i) the interest owners, and the rights of any other persons to become interest owners, in relation to each other, the LLC, and their ownership interests or rights to acquire ownership interests and (ii) the company officials in relation to each other, the LLC, and the interest owners. Subject to the limitations set forth in subsections (b), (c), (d), and (e) of [N.C. Gen. Stat. § 57D-2-30], the provisions of this Chapter and common law will apply only to the extent contrary or inconsistent provisions are not made in, or are not otherwise supplanted, varied, disclaimed, or nullified by, the operating agreement.

N.C. Gen. Stat. § 57D-2-30(a).

112. With some limitations, "the laws of agency and contract, including the implied contractual covenant of good faith and fair dealing and the requirement that the terms of an operating agreement not be unconscionable at the time they are made, govern the administration and enforcement of operating agreements." *Id.* § 57D-2-30(e).

113. "[M]embers of an LLC 'are like shareholders in a corporation in that members do not owe a fiduciary duty to each other or to the company.'" *Strategic Mgmt. Decisions, LLC v. Sales Performance Int'l LLC,* 2017 NCBC LEXIS 69, at *10 (N.C. Super. Ct. Aug. 7, 2017) (quoting *Kaplan v. O.K. Techs., L.L.C.*, 196 N.C. App. 469, 473 (2009)). "[M]embers have great freedom 'to arrange their relationship however they wish,'" so "they can change these default rules in the LLC's operating agreement." *Kixsports, LLC v. Munn,* 2021 NCBC LEXIS 32, at *14 (N.C. Super. Ct. Apr. 1, 2021) (quoting *Vanguard Pai Lung, LLC v. Moody*, 2019 NCBC LEXIS 39, at *17–18 (N.C. Super. Ct. June 19, 2019)). Thus, "[t]he rights and duties of LLC members are ordinarily governed by the company's operating agreement[.]" *Strategic Mgmt. Decisions,* 2017 NCBC LEXIS 69, at *10–11.

114. With respect to Plaintiffs' contract claims against Phillips as trustee of the Phillips Trust and Walcher Trust, as Defendants note, the parties agreed that MedShift's members waived "any claim or cause of action against the Board of Managers and each Member" other than for a breach of "the implied covenant of good faith and fair dealing by the Board of Managers under the [North Carolina Limited Liability Company Act]." (ECF No. 53.1, § 6.2(a)). To the extent allowed by law, the parties waived all fiduciary duties and limited all duties between members only to those expressly provided by the Operating Agreement. (ECF No. 53.1, § 6.2(a)).

115. The Board of Managers is defined in the Operating Agreement as "the Board of Managers elected and determined as provided in Section 6.1," (ECF No. 53.1, § 1), and, as alleged in Plaintiffs' amended complaint, is a Board consisting of

"Phillips, Foglio (or someone else appointed by Micota Capital), and Phil Van Etten." (Am. Compl. ¶ 43). The Board is not, however, a party to this action. (*See generally* ECF No. 35).

116. Further, the Phillip Trust and the Walcher Trust are members of MedShift, not managers, and Plaintiffs have not identified a viable claim against them in their role as members of the company. *See Strategic Mgmt. Decisions,* 2017 NCBC LEXIS 69, at \*10.

117. In short, considering the allegations of the amended complaint and the plain language of the Operating Agreement, Plaintiffs' claim for breach of contractual duties fails, and the Court will **DISMISS** this cause of action.

C.3.   Unjust Enrichment

118. For their unjust enrichment cause of action, Plaintiffs have sued Phillips individually as well as in his capacity as trustee of the Phillips Trust and the Walcher Trust. (Am. Compl. ¶¶ 148–54).

119. Plaintiffs contend that "Defendants have effectively received the Tiller's interest, or its value" in MedShift and have thereby been unjustly enriched. (Am. Compl. ¶¶ 150–51). Defendants contend that the unjust enrichment claim fails because there is a binding contract between the parties (i.e., the Operating Agreement) and because Plaintiffs plead that the interests at issue were *taken* rather than conferred. (ECF No. 52 at 8–10; ECF No. 81 at 4–5).

120. "A prima facie claim for unjust enrichment has five elements. First, one party must confer a benefit upon the other party. Second, the benefit 'must not have

been conferred officiously, that is it *must not be conferred by an interference in the affairs of the other party* in a manner that is not justified in the circumstances.' Third, the benefit must not be gratuitous. Fourth, the benefit must be measurable. Last, 'the defendant must have consciously accepted the benefit.'" *JPMorgan Chase Bank, Nat'l Ass'n v. Browning*, 230 N.C. App. 537, 541–42 (2013) (emphasis in original) (citations and internal punctuation omitted); *Rabinowitz v. Suvillaga*, 2019 NCBC LEXIS 8, at *28 (N.C. Super. Ct. Jan. 28, 2019) (noting that conclusory allegations will not suffice to allege an unjust enrichment claim).

121.    Plaintiffs have alleged the existence of a valid and binding contract governing the same subject matter as the unjust enrichment cause of action and have not indicated that the unjust enrichment cause of action is pleaded in the alternative. While this might be a sufficient basis on which to dismiss the claim, *compare Value Health Sols. Inc. v. Pharm. Rsch. Assocs., Inc.*, 2020 NCBC LEXIS 65, at *37 (N.C. Super. Ct. May 22, 2020) (dismissing unjust enrichment claim and declining to construe it as pleaded in the alternative), *with Cosma v. Fit Kitchen, LLC*, 2022 NCBC LEXIS 77, at *3 (N.C. Super. Ct. July 18, 2022) (N.C. Super. July 18, 2022) (denying motion to dismiss unjust enrichment claim made in the alternative), the Court need not make such a determination. Rather, the Court concludes that, even if Plaintiffs' unjust enrichment claim is properly pleaded in the alternative, it fails to state a claim upon which relief can be granted.

122. Plaintiffs allege that Defendants have wrongfully taken, or have passively "received," Plaintiffs' membership interest, or the value of that interest, in MedShift. (*E.g.*, Am. Compl. ¶¶ 124–28, 149–50).

123. Plaintiffs do not allege that they conferred (voluntarily or otherwise) any benefit on Defendants, and allegations of a wrongful taking of benefits or other deprivation by Defendants cannot support a claim for unjust enrichment. *See, e.g.*, *Am. Cirs., Inc. v. Bayatronics, LLC*, 2023 NCBC LEXIS 165, at *39 (N.C. Super. Ct. Dec. 8, 2023) (granting summary judgment for defendant where plaintiff "alleged a taking of information in violation of [a] Confidentiality Agreement, not a willing transfer of that information to the Bayatronics Defendants"); *Albritton v. Albritton*, 2021 NCBC LEXIS 53, at *34 (N.C. Super. Ct. June 7, 2021) ("Neither the allegations nor the facts in evidence support a claim for unjust enrichment. Movants have not alleged that [Plaintiffs] *conferred* benefits upon Defendants, but, rather, that Defendants took assets belonging to [Plaintiff]." (emphasis in original)); *Klos Constr., Inc. v. Premier Homes & Props., LLC*, 2020 NCBC LEXIS 85, at *48–51 (N.C. Super. Ct. July 21, 2020) (granting summary judgment on unjust enrichment claim where it was "undisputed that the [ ] Defendants *took* any benefit of Plaintiff's goodwill," such that the plaintiff could not have conferred it (emphasis added)); *KNC Techs., LLC v. Tutton*, 2019 NCBC LEXIS 72, at *36, (N.C. Super. Ct. Oct. 9, 2019) ("Alleging merely that the Defendants have taken for themselves some benefit to which Plaintiff believes it is rightfully entitled does not state a claim for unjust enrichment.").

124. Absent factual allegations suggesting that Plaintiffs conferred a measurable benefit on Defendants, and not merely that Defendants wrongfully took something from Plaintiffs, the amended complaint fails to state a claim for unjust enrichment. *JPMorgan*, 230 N.C. App. at 541–42.

125. Accordingly, the Court will **DISMISS** Plaintiffs' cause of action for unjust enrichment.

### C.4. Unlawful Distribution

126. Plaintiffs assert their fourth cause of action for unlawful distribution solely in a putatively derivative capacity. (Am. Compl. ¶¶ 155–58; *see also* ECF No. 69 at 21 ("While the Amended Complaint references individual harm for unlawful distributions, the gravamen of Count IV is that . . . the recipients or approving parties—namely, Defendants—are personally liable to ***the Company*** under § 57D-4-06." (emphasis in original))).

127. As set forth above, the Court will **DISMISS** all putative derivative claims in this action without prejudice for lack of standing and lack of subject matter jurisdiction. Thus, the Court need not, and does not, further address this cause of action.

### C.5. Fraud and Negligent Misrepresentation

128. Plaintiffs further assert causes of action for fraud and, alternatively, negligent misrepresentation—in both instances directly and derivatively against Phillips individually and in his capacity as trustee of the Phillips Trust and the Walcher Trust. (Am. Compl. ¶¶ 165–76, 192–97).

129. Defendants argue that Plaintiffs have failed to allege with particularity sufficient facts to state claims for fraud or negligent misrepresentation and that Plaintiffs have failed to allege reasonable reliance. (ECF No. 52 at 13–15). In opposition, Plaintiffs contend that justifiable reliance need not be pleaded with particularity and that, in any event, each alleged instance of fraud and negligent misrepresentation is sufficiently pleaded. (ECF No. 69 at 17–19). Ultimately, the Court agrees with Defendants that the allegations are deficient.

130. A party seeking to recover for fraud (whether framed as fraud, fraudulent inducement, or otherwise) must plead factual, non-conclusory allegations demonstrating the defendant's "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Ragsdale v. Kennedy*, 286 N.C. 130, 138 (1974) (citation omitted); *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 189 N.C. App. 601, 609–10 (2008) (quoting *McGahren v. Saenger*, 118 N.C. App. 649, 654 (1995)). "Additionally, any reliance on the allegedly false representations must be reasonable." *Head v. Gould Killian CPA Grp., P.A.*, 371 N.C. 2, 9 (2018) (citation omitted).

131. "A claim for fraud may be based on an affirmative misrepresentation of a material fact, or a failure to disclose a material fact relating to a transaction which the parties had a duty to disclose." *Hardin v. KCS Int'l, Inc.*, 199 N.C. App. 687, 696 (2009) (citation and quotation marks omitted).

132. Similarly, to state a claim for negligent misrepresentation, a plaintiff must allege that he "justifiably relie[d] to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 322 N.C. 200, 206 (1988) (citations omitted); *Sullivan v. Mebane Packaging Grp., Inc.*, 158 N.C. App. 19, 33 (2003).

133. "Justifiable reliance is an essential element of both fraud and negligent misrepresentation." *Helms v. Holland*, 124 N.C. App. 629, 635 (1996). For either claim, "to establish justifiable reliance a plaintiff must sufficiently allege that he made a reasonable inquiry into the misrepresentation and allege that he was denied the opportunity to investigate or that he could not have learned the true facts by exercise of reasonable diligence." *Arnesen v. Rivers Edge Golf Club & Plantation, Inc.*, 368 N.C. 440, 454 (2015) (citation and internal punctuation omitted).

134. "[W]hen the party relying on the false or misleading representation could have discovered the truth upon inquiry, the complaint must allege that he was denied the opportunity to investigate or that he could not have learned the true facts by exercise of reasonable diligence." *McFee v. Presley*, 2022 NCBC LEXIS 74, at *10 (N.C. Super. Ct. July 11, 2022) (alteration in original) (citing *Hudson-Cole Dev. Corp. v. Beemer*, 132 N.C. App. 341, 346 (1999)).

135. "[W]here the facts are insufficient as a matter of law to constitute reasonable reliance on the part of the complaining party, the complaint is properly dismissed under Rule 12(b)(6)." *Hudson-Cole Dev. Corp.*, 132 N.C. App. at 346 (citation omitted).

136. Finally, Rule 9(b) of the North Carolina Rules of Civil Procedure requires plaintiffs to plead fraud "with particularity." N.C. R. Civ. P. 9(b). "[I]n pleading actual fraud[,] the particularity requirement is met by alleging time, place and content of the fraudulent representation, identity of the person making the representation and what was obtained as a result of the fraudulent acts or representations." *Value Health Sols., Inc. v. Pharm Rsch. Assocs.*, 385 N.C. 250, 263 (2023) (alterations in original) (quoting *Terry v. Terry*, 302 N.C. 77, 85 (1981)).

137. The same particularity requirement applies to claims for negligent misrepresentation. *Id.* at 265–66 (collecting cases); *Deluca v. River Bluff Holdings II, LLC*, 2015 NCBC LEXIS 12, at *20 (N.C. Super. Ct. Jan. 28, 2015).

138. In determining whether these pleading requirements are met, the Court need not accept conclusory allegations. *E.g.*, *Quidore v. All. Plastics, LLC*, 2020 NCBC LEXIS 140, at *16 (N.C. Super. Ct. Dec. 3, 2020) (dismissing fraud claims where allegations of reliance and inability to investigate were conclusory).

139. Considering these standards and construing the allegations of the amended complaint in the light most favorable to Plaintiffs, the allegations fail to state a claim for fraud or negligent misrepresentation.

140. As set forth above, Plaintiffs' fraud and negligent misrepresentation causes of action are premised upon alleged misrepresentations in connection with the Cloud Services Dispute, the Credit Agreement/Income Tax Dispute, the Quarterly Taxes Dispute, the Bridge Loan Dispute, and the Equity Pool Dispute. (Am. Compl. ¶¶ 55–56, 61–67, 71–74, 168–69, 171–73; ECF No. 69 at 18–19).

141.  Cloud Services Dispute: Ultimately, Plaintiffs have not briefed the merits of the Cloud Services Dispute. To the extent that Plaintiffs nonetheless rely on it for their fraud or negligent misrepresentation cause of action, however, it fails to state a claim.

142.  Among other things, Plaintiffs fail to (i) identify to whom the alleged memorandum concerning cloud services was circulated, stating only that it was an "internal memorandum," (ii) identify the alleged misrepresentations, claiming only that the memorandum did "not accurately describe" MedShift's services and that Phillips "exaggerated" the unspecified information, (iii) plead non-conclusory allegations suggesting that Plaintiffs in any way relied (much less reasonably relied) on or were deceived by the unidentified information, alleging only that the alleged misrepresentation was "so that the company could obtain additional funding" from an unidentified source, or (iv) identify any factual, non-conclusory allegations suggesting how Plaintiffs, rather than MedShift, were or even could have been damaged. (Am. Compl. ¶¶ 71, 171, 174, 195–96). These allegations fail to state a claim. *S.N.R. Mgmt. Corp.*, 189 N.C. App. at 610–11.

143.  Credit Agreement/Income Tax Dispute: Similarly, Plaintiffs have failed to brief the merits of the Credit Agreement/Income Tax dispute. Moreover, in the amended complaint, Plaintiffs did not  (i) identify to whom the unidentified statements were "exaggerated," (ii) describe the substance of the alleged exaggeration, (iii) plead anything more than conclusory statements suggesting that Plaintiffs in any way relied (much less reasonably relied) on or were deceived by the

unidentified information, alleging only that the exaggerations were "to avoid having to restate prior financials, to avoid restatement of the credit agreement with one of MedShift's lenders, and to avoid a federal and state income tax liability," or (iv) identify any factual, non-conclusory allegations suggesting how Plaintiffs, rather than MedShift, were, or even could have been, damaged. (Am. Compl. ¶¶ 72, 172). These allegations fail to state a claim. *S.N.R. Mgmt. Corp.*, 189 N.C. App. at 610–11.

144. <u>Quarterly Taxes Dispute</u>: The Quarterly Taxes Dispute fails initially because there is no alleged harm to Plaintiffs. Rather, Plaintiffs plead—and reiterate in their briefing—that the alleged harm resulting from any misrepresentations regarding the Quarterly Taxes Dispute was that it "resulted in *the Company* being burdened with interest and penalties." (ECF No. 69 at 18–19; Am. Compl. ¶¶ 73–74, 173). As Plaintiffs lack standing to assert a derivative claim on behalf of MedShift and their putative derivative claims have been dismissed, this cause of action is properly dismissed as to the Quarterly Taxes Dispute for failure to allege the requisite harm to Plaintiffs. *S.N.R. Mgmt.*, 189 N.C. App. at 610–11.

145. Further, Plaintiffs do not allege that Defendants, or Phillips specifically, made any particular statement to them with respect to taxes. Though Plaintiffs assert that Defendants' purported failure to pay MedShift's tax liabilities (a failure that itself is pleaded upon information and belief) was "[d]espite representations to the contrary," there are no factual allegations as to what the purported representations to the contrary were, to whom they were made, or when they were made. (Am. Compl. ¶¶ 73, 173). Moreover, once again, the only allegations of

deception and reliance are entirely conclusory. (Am. Compl. ¶ 174). Thus, these allegations fail to state a claim *S.N.R. Mgmt.*, 189 N.C. App. at 610–11.

146. <u>Bridge Loan Dispute and Equity Pool Dispute</u>: The Bridge Loan Dispute and the Equity Pool Dispute are, at best, vaguely pleaded. Considered in the light most favorable to the non-moving Plaintiffs, the allegations fall short of meeting Plaintiffs' pleading burden, as Plaintiffs do not allege that they made a reasonable inquiry into either alleged misrepresentation and do not plead facts suggesting that they were denied an opportunity to investigate or could not have learned the true facts by exercising reasonable diligence. *Arnesen*, 368 N.C. at 454.

147. Instead, as to the Bridge Loan Dispute, Plaintiffs plead only that Phillips asserted that MedShift needed a bridge loan, that Phillips explained why he did not want to make the loan personally, that Phillips requested that the Tillers loan $1.5 million to MedShift for ninety days, and that "the Tillers agreed, and wired the loaned funds in late December 2022." (Am. Compl. ¶ 55). Plaintiffs do not plead non-conclusory facts demonstrating that they questioned Phillips's or MedShift's motives, that they substantively investigated the basis for Phillips's request, that they conducted any due diligence whatsoever, or that they were prevented from doing so.

148. Similarly, Plaintiffs assert that the circumstances surrounding the Equity Pool Dispute occurred in "early 2023" and specifically began at least on 1 March 2023, culminating with their execution of the operative Operating Agreement around 31 March 2023. (Am. Compl. ¶¶ 60–69). Despite a month or more of discussions regarding the equity pool, Plaintiffs do not allege facts suggesting that they made

reasonable inquiry into the alleged misrepresentations and, instead, suggest that the few questions they did ask should have raised more questions. (*See, e.g.*, Am. Compl. ¶ 65 (asserting that, in response to questions about the equity pool, "Phillips deflected those inquiries by saying that it was not yet determined")).

149. Ultimately, Plaintiffs allege in conclusory fashion that they reasonably relied on the misrepresentations and that they were "induced to forego additional investigation, and/or were not given the opportunity to conduct additional investigation." (Am. Compl. ¶¶ 170, 174, 196).

150. Plaintiffs' lone factual allegation supporting this statement, however, is not that they were prevented from accessing MedShift's books and records but merely stating that they *complained* to Foglio in October 2023 about a lack of access to the books and records. (Am. Compl. ¶ 87). Plaintiffs do not identify instances when they sought access to books and records but were denied. Even if those allegations were sufficient to suggest denial of an opportunity to investigate, however, the Bridge Loan Dispute arose in December 2022 and the Equity Pool Dispute arose in March 2023—both months *before* Plaintiffs claim that they even raised the specter of a books and records inquiry in October 2023. (*Compare* Am. Compl. ¶¶ 55–69, 168–69 *and* ECF No. 69 at 18–19, *with* Am. Compl. ¶ 87).

151. As to the Equity Pool Dispute specifically, the pleaded facts reflect that there could be no reasonable reliance. Plaintiffs assert that they authorized the transaction *not* in reliance on Phillips's representations but only "[u]nder duress" and in light of "Defendants' manufactured urgency." (Am. Compl. ¶ 69; ECF No. 69 at 6–

7). Plaintiffs insist that they did so because "Plaintiffs believed they were held hostage on giving up some of their shares because they had loaned the Company money that would not be paid back unless they immediately executed" the documents. (Am. Compl. ¶ 69). In short, the facts as pleaded affirmatively allege that the Plaintiffs authorized the transaction not in reliance on a particular representation by Phillips but instead based on Plaintiffs' subject perceptions of "duress" and "urgency" because they "believed" it was in their best interest to do so to obtain repayment of a loan. (Am. Compl. ¶ 69).

152. Further, inasmuch as the Bridge Loan Dispute is premised upon Phillips's alleged statement that MedShift "*needed* a 90-day bridge loan," a statement as to the company's needs reflects a subjective opinion and assessment that is open to interpretation. Without a more particularized allegation of factual representations, the Court determines that such a statement under the circumstances is not actionable as the basis for a fraud or negligent misrepresentation claim. *See Quidore*, 2020 NCBC LEXIS 140, at *12 ("Rather than assert objective provable facts, however, Quidore's alleged statements reflect subjective opinion and assessment (and perhaps exaggeration) in these circumstances and are open to differing perceptions of what level or amount is 'substantial' and what qualifies as a 'connection[ ].' . . . As such, the Court concludes that these alleged representations are not material as a matter of law and, as asserted here, cannot support a fraud claim under North Carolina law.").

153. Thus, the fraud and negligent misrepresentation causes of action fail to state a claim and are properly **DISMISSED**. *See Chisum v. Campagna*, 2017 NCBC

LEXIS 102, at *29–30 (N.C. Super. Ct. Nov. 7, 2017) (finding no justifiable reliance for a fraud claim where the plaintiff failed to exercise available record inspection rights).

### C.6. Conversion

154. Next, Plaintiffs assert a cause of action for conversion. The cause of action is framed as being brought derivatively on behalf of MedShift and on behalf of each Plaintiff against "Phillips, the Phillips Trust, and the Walcher Trust." (Am. Compl. at 20 (heading)). The allegations in the amended complaint, however, are tied only to Plaintiff's contention that Defendants "exercised ownership and control over the Tillers' membership interest in MedShift." (Am. Compl. ¶ 178; *see generally* Am. Compl. ¶¶ 177–80).[11]

155. In moving to dismiss this cause of action, Defendants argue that a membership interest in MedShift is an intangible interest and that the cause of action is barred by the economic loss rule. (ECF No. 52 at 10–12). The Court agrees that the conversion cause of action is barred as pleaded.

156. "Conversion is defined as 'an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition *or the exclusion of an owner's rights.*'" *Norman v. Nash*

---

[11] In their briefing, Plaintiffs contend their conversion claim is based not only on their interest in MedShift, but also on the conversion of *MedShift's* monetary interests including certain cash-back rewards from MedShift's credit card. (ECF No. 69 at 17 (heading: "Conversion of MedShift's Monetary Interests"; arguing that Phillips "deprived *MedShift* of over $2 million in cash-back rewards from the Company credit card.")). However, this claim is derivative in nature, and, as set forth above, Plaintiffs lack standing to assert it, such that it is properly dismissed.

*Johnson & Sons' Farms, Inc.*, 140 N.C. App. 390, 414 (2000) (citation omitted) (emphasis in original).

157. Consequently, the subject of a valid conversion claim must be tangible in nature. *Id.* ("A claim for conversion does not apply to real property. . . . Nor are intangible interests such as business opportunities and expectancy interests subject to a conversion claim."); *Window World of N. Atlanta, Inc. v. Window World, Inc.*, 2018 NCBC LEXIS 111, at *8–9 (N.C. Super. Ct. Oct. 22, 2018) ("[A]n intangible interest cannot provide the basis for a conversion claim.").

158. "Membership in an LLC is also an intangible interest." *McFee*, 2022 NCBC LEXIS 74, at *14; *Surratt v. Brown*, 2015 NCBC LEXIS 75, at *16 (N.C. Super. Ct. July 27, 2015) (determining that an LLC/partnership interest was "intangible").

159. As is the case throughout their amended complaint, Plaintiffs fail to make any substantive distinction between the Tillers and the Tiller Trust with respect to the conversion cause of action. To the extent that the *Tillers* assert a cause of action for conversion with respect to the "the Tillers' membership interest in MedShift," (Am. Compl. ¶ 178), the claim necessarily fails because the membership interest at issue is not the Tillers' but is instead the Tiller Trust's—as Plaintiffs themselves plead in the amended complaint and acknowledge in briefing. (Am. Compl. ¶ 40; *see Norman*, 140 N.C. App. at 414; *see also* ECF No. 69 at 16 (arguing that the claim relates to the "Tiller Trust's interest in MedShift")).

160. Further, the conversion cause of action fails in all respects because the membership interest at issue is intangible and not subject to a conversion claim.

Plaintiffs do not contend that a membership certificate or other tangible manifestation of the membership interest was taken. Rather, they allege that the abstract, intangible interest itself was converted.

161. The cause of action for conversion therefore fails and will be **DISMISSED**. *See McFee*, 2022 NCBC LEXIS 74, at \*14 ("Membership in an LLC is also an intangible interest."). Accordingly, since the Court has dismissed the conversion cause of action as set forth above, the Court need not, and does not, further address the economic loss argument.

### C.7.   Tortious Interference with Contract

162. Plaintiffs next assert, both derivatively and individually, a cause of action against Phillips for tortious interference with contract. (Am. Compl. ¶¶ 182–87). Defendants argue that Plaintiffs have failed to plead the elements of a tortious interference claim and have also failed to allege that Phillips acted without justification, such that his qualified privilege as an "insider" of MedShift bars the claim. (ECF No. 52 at 24–25).

163. "The elements of a tortious interference with a contract claim are: (1) a valid contract existed between the plaintiff and a third person, conferring upon the plaintiff some contractual right against the third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) the defendant acts without justification; and (5) the defendant's conduct causes actual pecuniary harm to the plaintiffs." *Pinewood Homes, Inc. v.*

*Harris*, 184 N.C. App. 597, 604 (2007) (citing *Childress v. Abeles,* 240 N.C. 667, 674 (1954)).

164. "The acts of a corporate officer are generally presumed to have been done in the interests of the corporation, but that presumption may be 'overcome when the means or the officer's motives are improper.'" *Gupta v. Eli Global, LLC*, 2019 NCBC LEXIS 40, at *26 (N.C. Super. Ct. June 19, 2019) (quoting *Embree Constr. Grp., Inc. v. Rafcor, Inc.*, 330 N.C. 487, 498–99 (1992)). This privilege "is qualified, not absolute," and is generally overcome by factual allegations suggesting that the corporate officers acted for the officer's "*own* benefit" or "personal interest." *Embree*, 330 N.C. at 498–99 (emphasis in original) (citations omitted).

165. Defendants do not dispute that Plaintiffs have adequately alleged sufficient facts to state each element of a tortious interference claim other than the requirement to plead that Phillips acted without justification, (*see generally* ECF No. 52), and the Court determines that Plaintiffs have sufficiently alleged those elements of the claim.

166. With respect to whether Phillips acted without justification, though the amended complaint is not a model of clear pleading, Plaintiffs allege, among other things, that (i) "Phillips did not have a valid basis for claiming that all of Plaintiffs' shares and interest in the Company was [sic] forfeited," (Am. Compl. ¶ 125), (ii) Phillips repeatedly attempted to purchase the Tiller Trust's membership interest in MedShift at a reduced rate with no success before ultimately reaching an agreement in late 2023 that did not ultimately close, (Am. Compl. ¶¶ 54, 88, 90, 102–03, 118–20), (iii) Phillips engaged in discussions with third parties regarding a "deal" to sell

the Tiller Trust's membership interest, (Am. Compl. ¶ 84), and (iv) they "believe that . . . Phillips had identified a potential buyer for the Tiller Trust's shares, which Phillips wanted to sell for his personal gain." (Am. Compl. ¶ 96).[12]

167. Ultimately, Plaintiffs have sufficiently pleaded that Phillips had a personal interest in and attempted to purchase the Tillers' or Tiller Trust's interest in MedShift on several occasions and was rebuffed by the Tillers, (Am. Compl. ¶ 54), and that Phillips repeatedly withdrew money from MedShift for personal purposes, (*e.g.*, Am. Compl. ¶ 56), such that he had a personal interest in interfering with the Tiller Trust's rights under the Operating Agreement.

168. Thus, considering all allegations and permissible inferences of the amended complaint in the light most favorable to Plaintiffs as the Court is compelled to do at this preliminary stage of the litigation, the Court determines that Plaintiffs have adequately alleged facts permitting the inference that Phillips acted in his own self-interest rather than the interests of MedShift and that his conduct was neither justified nor privileged. *See, e.g., Embree*, 330 N.C. at 501 (holding that on a motion to dismiss for interference by an insider, plaintiff's allegation that defendants acted "in their own interest to avoid further liability" was enough to show the defendant acted without justification); *Gupta*, 2019 NCBC LEXIS 40, at *26–27 (finding that

---

[12] Despite the amended complaint's myriad pleading deficiencies, the Court construes Plaintiffs' statement of belief as a permissible allegation made upon information and belief. *See, e.g., Myrtle Apartments, Inc. v. Lumbermen's Mut. Cas. Co.*, 258 N.C. 49, 51 (1962) ("In stating his cause of action a plaintiff has the laboring oar. He may allege facts based on actual knowledge, or upon information and belief.").

plaintiff sufficiently alleged a company insider acted without justification such that dismissal at the Rule 12(b)(6) stage was improper).

169.    The Court therefore cannot determine "beyond doubt [Plaintiffs] could prove no set of facts in support of [their] claim which would entitle [them] to relief," *Gouch v. Rotunno*, 291 N.C. App. 7, 10 (2023) (citation omitted), and accordingly will **DENY** the motions to dismiss the cause of action for tortious interference.

C.8.    Facilitation of Civil Conspiracy

170.    Finally, Plaintiffs assert a cause of action for "[f]acilitation of [c]ivil conspiracy." (Am. Compl. at 21). However, no such claim or cause of action exists in North Carolina,[13] and any such cause of action here is properly dismissed.

171.    To the extent that Plaintiffs' cause of action is instead an attempt to assert a claim for civil conspiracy, as their briefing suggests, that too is not a standalone claim and "does nothing more than associate the defendants together and perhaps liberalize the rules of evidence to the extent that under proper circumstances the acts and conduct of one might be admissible against all." *Shope v. Boyer*, 268 N.C. 401, 405 (1966) (citation omitted); *New Restoration & Recovery Servs., LLC v. Dragonfly Pond Works, LLC*, 2023 NCBC LEXIS 80, at *23 (N.C. Super. Ct. June 15, 2023) (citations omitted).

172.    Thus, "[t]o create civil liability for conspiracy there must have been a wrongful act resulting in injury to another committed by one or more of the conspirators pursuant to the common scheme and in furtherance of the objective."

---

[13] Indeed, a thorough search of several legal databases finds no reference to, or recognition of, any such claim or cause of action in any state or federal proceeding.

*Krawiec v. Manly*, 370 N.C. 602, 613 (2018) (citations omitted). To adequately allege such a basis for civil liability, a party must allege "(1) a conspiracy, (2) wrongful acts done by certain of the alleged conspirators in furtherance of that conspiracy, and (3) injury as a result of that conspiracy." *Id.* at 614.

173. The alleged conspiracy must also involve "an agreement between two or more persons." *Boyd v. Drum*, 129 N.C. App. 586, 592 (1998) (citation omitted).

174. Here, Plaintiffs assert that "Defendants" (i.e., Phillips individually, Phillips as Trustee of the Phillips Trust, and Phillips as Trustee of the Walcher Trust) "all agreed to defraud Plaintiffs and [MedShift] and engage in other wrongful conduct towards Plaintiffs and [MedShift]" and that "Defendants" (again, Phillips in three separate capacities) "committed overt and tortious acts in furtherance of that agreement." (Am. Compl. ¶¶ 189–90).

175. Plaintiffs do not allege in the amended complaint (or even argue in their briefing) that Phillips conspired or otherwise entered into a conspiratorial agreement with anyone other than himself. (Am. Compl. ¶¶ 189–90).

176. "Obviously, one person may not conspire with himself." *State v. Gallimore*, 272 N.C. 528, 533 (1968) (citations omitted). This truism, though stated in a criminal case, is equally applicable in the civil context. Indeed, "[i]t would defy logic to hold that a natural person can conspire with himself." *McCarron v. Howell*, 2024 NCBC LEXIS 144, at *19 (N.C. Super. Ct. Nov. 19, 2024) (determining that, since plaintiff asserted the conspiring entities "had no actual existence separate from Howell himself, the resulting implication is that Howell sought to conspire with himself").

177. Regardless of whether he has a personal interest in the dispute and whether he is alleged to be the alter ego of MedShift, the Phillips Trust, and the Walcher Trust, (Am. Compl. ¶¶ 160–64; ECF No. 69 at 19, 23), Phillips cannot conspire with himself, and Plaintiffs have not alleged that he conspired with anyone else.

178. Thus, the amended complaint fails to state a claim for either civil conspiracy or facilitation of a civil conspiracy, and these causes of action are appropriately **DISMISSED**.

### III.  CONCLUSION

179. Accordingly, the Court hereby **GRANTS in part** and **DENIES in part** Defendants' and Nominal Defendant's motions to dismiss as set forth above, **DENIES as moot** Plaintiffs' motion to strike, and **ORDERS** as follows:

a. All causes of action and purported claims asserted by Plaintiffs on behalf of MedShift are **DISMISSED** without prejudice;

b. Except for Plaintiffs' Eighth Alternative Claim for Relief (Tortious Interference with Contract) to the extent it is pleaded on behalf of Plaintiffs individually, all causes of action and purported claims asserted by Plaintiffs on behalf of themselves are **DISMISSED**;

c. The stay of discovery imposed by the Court's Case Management Order, (ECF No. 28), is hereby **LIFTED**; and

d. Counsel are **DIRECTED**, within ten days from entry of this Order, to conduct a case management conference and file a supplemental

case management report that contains a proposed discovery schedule and addresses all other matters required by Rule 9 of the North Carolina Business Court Rules.

**SO ORDERED**, this 15th day of October 2025.

/s/ Matthew T. Houston
_____
Matthew T. Houston
Special Superior Court Judge
 for Complex Business Cases